PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DESIREE JOHNSON, | ) | |
| | ) | CASE NO.  4:11CV01635 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CITY OF YOUNGSTOWN, OHIO, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION &** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 30] |

Pending before the Court is the City of Youngstown and Chief of Police Jimmy Hughes's

motion for partial summary judgment.  ECF No. 30.  Plaintiff filed an opposition brief; Defendants

replied.  ECF Nos. 34 and 36.  For the reasons provided, the Court denies the motion for partial

summary judgment.

## I.  Factual and Procedural Background

Plaintiff Desiree Johnson, mother and next friend of minor child "B.R.," filed this lawsuit

against Defendants City of Youngstown, Chief of Police Jimmy Hughes, and Police Officers Kevin

Mercer, Patrick Mulligan, and Malik Mostella.  In her deposition, Plaintiff testified to the following

facts.  On July 10, 2009, B.R., a twelve-year old African-American boy, was playing basketball with

friends on Kenmore Street in Youngstown.  ECF No. 30-1 at 13; *see* ECF No. 8 at 4 and 8.  From

about twenty-five yards away, Plaintiff watched B.R. from her front porch.  ECF No. 30-1 at 13.

Plaintiff asked her daughter to go down the street and "get" B.R. because he had not cleaned his

room as told.  ECF No. 30-1 at 13.  When B.R. continued to play basketball, Plaintiff gave him a

(4:11CV01635)

"look." ECF No. 30-1 at 13. B.R. "came up running" and ran past Plaintiff toward the back of the house, where Plaintiff and her children normally entered and exited. ECF No. 30-1 at 13-14. At that time, two police cars pulled up. ECF No. 30-1 at 13. Officers Mercer and Mostella exited the vehicles, and ran up Plaintiff's driveway to her backyard with their weapons drawn. ECF No. 30-1 at 13, 15. A third police officer, Officer Mulligan, approached on foot from an open field beside the house. ECF No. 30-1 at 13-14. Plaintiff stayed where she was until Officer Mostella went back to her and ordered, "come get your dog." ECF No. 30-1 at 14. Plaintiff then proceeded to her backyard where she saw the three officers with B.R. ECF No. 30-1 at 14. Plaintiff's dog, Lucky, was sitting between B.R.'s legs. ECF No. 30-1 at 14. Plaintiff took control of the dog. ECF No. 30-1 at 14. Officer Mercer put B.R.'s arms behind his back and reached "down [B.R.'s] shorts, down his crack, to his groin." ECF No. 30-1 at 14. While Officer Mercer was searching B.R., Officer Mulligan pointed his gun "a couple inches" from B.R.'s face. ECF No. 30-1 at 15. Plaintiff screamed and asked the officers what they were doing. ECF No. 30-1 at 14. Officer Mostella waved his gun, ordered Plaintiff to calm down, and "[k]ept on saying that he was going to shoot." ECF No. 30-1 at 14-15. Officer Mulligan explained to Plaintiff that the officers "saw [B.R.] running." ECF No. 30-1 at 14. Lucky began barking when Officer Mercer started searching B.R., but the officers never pointed their guns at Lucky. ECF No. 30-1 at 16. The officers did not find drugs, weapons, or contraband, and did not arrest B.R. ECF No. 30-1 at 22; *see* ECF No. 8 at 6.

Count One of the amended complaint alleges that Officers Mercer, Mulligan, and Mostella, in their individual and official capacities as Youngstown police officers, used excessive and unreasonable force, and searched and seized B.R. without probable cause or justification, in violation

2

(4:11CV01635)

of the Fourth and Fourteenth Amendments to the United States Constitution.  ECF No. 8 at 7-8.

Count Two alleges that B.R.'s constitutional injuries were caused by an established custom or policy

within the Youngstown police department "that permits the use of excessive force and [the]

searching, seizing, and detaining of young African-American males without the existence of

probable cause or reasonable suspicion"; and that the City of Youngstown and Chief Hughes, in his

official capacity as the Chief of the Youngstown police department, failed to train and supervise

police officers.  ECF No. 8 at 8-10.  Count Three alleges a cause of action against Officers Mercer

and Mulligan for intentional infliction of emotional distress.  ECF No. 8 at 10-11. Plaintiff seeks

damages, attorney's fees, and costs.

After Defendants filed an amended answer, the City of Youngstown and Chief Hughes

(hereinafter collectively "the City")[1] moved for partial summary judgment with respect to Count Two

of the amended complaint.  The City claims that Plaintiff has presented no evidence that would

entitle her to prevail on her *Monell* claim.  ECF No. 30.  Plaintiff filed an opposition brief and

various exhibits; ECF Nos. 34 and 35; and the City filed a reply.  ECF No. 36.  The motion is ripe

for the Court's adjudication.

---

[1] The City and Chief Hughes, who is sued only in his official capacity, will be referred to
collectively as "the City" because "individuals sued in their official capacities stand in the shoes
of the entity they represent."  *Alkire v. Irving*, 330 F.3d 802, 810 (6ᵗʰ Cir. 2003).

3

(4:11CV01635)

## II. Legal Standard

"Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (*quoting* Fed. R. Civ. P. 56(a)). "'A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the nonmoving party.'" *U.S. ex rel. Wall v. Circle C Construction, LLC*, 697 F.3d 345, 351 (6th Cir. 2012) (*quoting Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)). A court deciding a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Kuhn v. Washtenaw County*, 709 F.3d 612, 620 (6th Cir. 2013). "Where the moving party carries its initial burden, the nonmoving party 'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of East Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (*quoting Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)); *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) ("a mere 'scintilla' of evidence in support of the nonmoving party's position is insufficient to defeat summary judgment").

## III. Discussion

The City argues that it is entitled to partial summary judgment with respect to Count Two because Plaintiff cannot point to evidence that the City failed to train or supervise its police officers "in the avoidance of constitutional deprivations." ECF No. 30 at 6. More broadly, the City claims that Plaintiff has not presented evidence of a City policy that was the "moving force" behind the constitutional deprivations alleged. ECF No. 30 at 5. Therefore, the City contends, Plaintiff's

4

(4:11CV01635)

*Monell* claim must fail.[2]  ECF No. 30 at 5.  In response, Plaintiff asserts that a genuine issue of material fact exists.  ECF No. 34 at 6.  Plaintiff maintains that she has presented sufficient evidence to show that the Youngstown police department failed to conduct an adequate investigation into the incident involving her son, B.R.  ECF No. 34 at 5-6.  Furthermore, Plaintiff claims that the City failed to adequately investigate and discipline Officer Mercer regarding prior allegations of misconduct against minorities.  ECF No. 34 at 6.  According to Plaintiff, there is evidence for a jury to find that the City has adopted a custom of tolerating federal rights violations.  ECF No. 34 at 6.

This lawsuit is brought under 42 U.S.C. § 1983.[3]  Section 1983 creates no substantive rights; rather, it provides remedies for deprivations of rights established elsewhere.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).  To prevail under the statute, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6ᵗʰ Cir. 2006).

In *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the Supreme Court announced that municipalities may be held liable

---

[2] The City also moves for summary judgment with respect to any state law claims that might be asserted in Count Two.  ECF No. 30 at 7-8.  Because Plaintiff makes clear in her opposition brief that no state law claims are asserted against the City; ECF No. 34 at 7; the Court does not need to resolve this aspect of the City's motion.

[3] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

(4:11CV01635)

under § 1983 if the injury was caused by an "official policy" or "custom" of the municipality.  The reason for restricting municipal liability to injuries caused by a policy or custom was the Supreme Court's determination that Congress did not intend for § 1983 to impose *respondeant superior* liability upon municipalities for injuries inflicted solely by its employees or agents.  *Id.* at 695. Therefore, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 406-407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (emphasis in original).  There must, rather, have been "deliberate conduct" by the municipality.  *Id.* at 404.

A plaintiff can make a showing of an "illegal policy or custom" by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff does not present evidence of an official policy or legislative enactment, evidence that a final decision-maker ratified illegal acts, or evidence showing that the City failed to train or supervise its police officers (although the latter is alleged).  Rather, Plaintiff proffers evidence purporting to show that the City repeatedly failed to adequately investigate federal rights violations or take appropriate disciplinary action.  Plaintiff's proof relates to a "custom-of-tolerance" theory of § 1983 liability.  *See Burgess*, 735 F.3d at 478 ("a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims"); *Berry v. City of Detroit*, 25

6

(4:11CV01635)

F.3d 1342, 1346 (6th Cir. 1994) (city's failure to discipline police officers may indicate deliberate indifference to rights of inhabitants); Leach v. Shelby County Sheriff, 891 F.2d 1241, 1248 (6th Cir. 1990) (failure to investigate and discipline may show municipality's "ratification of illegal acts"); Daniels v. City of Columbus, No. C200562, 2002 WL 484622 at *5 (S.D. Ohio February 20, 2002) ("in some cases, the municipality may be held liable where its failure to conduct an investigation or discipline the accused rises to the level of a policy of acquiescence that in itself was a moving force" behind federal rights deprivations [quotations omitted]).

In order for inadequate investigations to demonstrate a municipal custom of tolerating or acquiescing federal rights violations, Plaintiff must not only show that the investigation into her claim was inadequate, but that the flaws in that particular investigation "were representative of (1) a clear and persistent pattern of illegal activity, (2) which the [City] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [City's] custom was the cause" of the constitutional deprivations at issue. Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir.), cert. denied, 546 U.S. 814, 126 S. Ct. 338, 163 L. Ed. 2d 50 (2005).  Thus, the Sixth Circuit in Thomas held that the plaintiffs failed to show a genuine issue of material fact as to whether the police department had a custom of condoning the use of excessive force, because the plaintiffs presented evidence of a "potentially insufficient investigation" of only one case–that involving one of the plaintiffs–but not evidence of "any possibility of a pattern."  Id. at 433-34.

A failure-to-discipline claim is assessed under a similar framework.  Berry, 25 F.3d at 1354 ("[i]n the failure to discipline context, it is appropriate to apply the deliberate indifference standard"). As with a failure-to-investigate claim, deliberate indifference on the part of the municipality may be

7

(4:11CV01635)

demonstrated by "a showing of a pattern of violations from which a kind of 'tacit authorization' by city policymakers can be inferred." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (O'Connor, J., concurring in part and dissenting in part).  Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County*, 520 U.S. at 410.  When a § 1983 plaintiff can establish that "the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton*, at 396.

After the incident involving B.R., Plaintiff filed a complaint with the Youngstown police department. ECF No. 30-1 at 43.  Later, Plaintiff received a letter from the Internal Affairs Division of the police department informing her that her allegations were "unfounded." ECF No. 30-1 at 18, 45.  The letter stated that "the police officers who displayed their weapons did so only in response to your large canine that was acting aggressive[ly] towards them.  Though your son was present at the time, their actions were not directed at him."  ECF No.30-1 at 45.  In an affidavit, Plaintiff testified that the Internal Affairs investigator never attempted to (1) speak with her about the incident, other than taking her complaint; (2) speak with B.R.; (3) speak with her daughter, who was a witness; (4) ascertain the names of the friends B.R. was playing basketball with that day; and (5) view Lucky, the dog.  ECF No. 34-1.

When viewed in the light most favorable to Plaintiff, the evidence shows that the City's investigation was cursory, one-sided, and incomplete.  The City failed to take the most basic of investigative steps, including interviewing the alleged victim, B.R., and other available witnesses.

8

(4:11CV01635)

The City gave full credit to the officers' account regarding their use of force and determined that Plaintiff's allegations were untrue.  Also disconcerting, is the evidence showing that the City overlooked or ignored Officer Mercer's rough, invasive, and unjustified search of B.R., a twelve-year old child.  Additionally, the letter issued by the Internal Affairs Division conspicuously failed to address Officer Mercer's search in its discussion of Plaintiff's allegations.

Although the City's failure to properly investigate the incident and take appropriate disciplinary action is concerning, the failure, by itself, is insufficient to constitute a *Monell* claim. When the City's response to the events in the instant case, however, is considered in conjunction with evidence of other allegations of misconduct in Officer Mercer's personnel file, there emerges a pattern of federal rights violations which appears to have been acquiesced to or tolerated by the City.

Officer Mercer's file reveals a complaint filed by Terrance Jones regarding an incident that occurred outside Jones's residence on December 18, 2007.  ECF No. 35-2 at 1-3.  According to the Internal Affairs investigation, Officer Mercer conducted a car stop in front of the residence at approximately 11:50 a.m.  ECF No. 35-2 at 5.  Officer Mercer called for a K-9 Unit when he became suspicious that the driver of the car was carrying contraband.  ECF No. 35-2 at 5.  Shortly thereafter, another officer, Sergeant Rutherford, arrived on the scene with a police dog.  ECF No. 35-2 at 5. The dog, after exiting the police car, urinated on Jones's property.  At that point, Jones began to yell profanities at the officers from a window.  ECF No. 35-2 at 5.  Sergeant Rutherford instructed Jones to mind his own business, whereupon Jones closed the window.  ECF No. 35-2 at 5.

9

(4:11CV01635)

When the dog indicated that there may be drugs hidden inside the vehicle, Officer Mercer and Sergeant Rutherford began to question the driver.  ECF No. 35-2 at 5.  At that time, Jones exited his front door and "began to distract the officers" from the steps of his front porch.  ECF No. 35-2 at 5-6.  Jones told the driver of the vehicle that the police could not search the car and inquired whether the driver was "alright."  ECF No. 35-2 at 6.  Officer Mercer instructed Jones to go back inside his home.  ECF No. 35-2 at 6.  Jones protested that he was on his property and the officers could not tell him what to do.  ECF No. 35-2 at 6.  Officer Mercer then walked up to Jones, and, according to Officer Mercer's own statements to the Internal Affairs investigator, tried to grasp Jones's forearm and "attempted to move [Jones] into his residence . . . ."  ECF No. 35-2 at 6 and 11. According to Officer Mercer, Jones slapped the officer's hand away, pushed Officer Mercer, and "squared off as if getting ready to fight."  ECF No. 35-2 at 6.  A struggle ensured, during which the officers restrained Jones, and Officer Mercer applied a choke hold.  ECF No. 35-2 at 6.  Jones was then arrested for obstruction of official business and resisting arrest.  ECF No. 35-2 at 7.

In the City's investigation of Jones's complaint, it determined that "[t]he only issue at question to be resolved was the appropriateness of the neck vascular restraint on the complainant under these circumstances."  ECF No. 35-2 at 7.  The investigation concluded that Officer Mercer's conduct was "proper," and exonerated him.  ECF No. 35-2 at 9.

The limited focus of the City's investigation is alarming.  The investigation glossed over Officer Mercer's initial acts of encroaching upon Jones's property and attempting to force Jones back into his home.  ECF No. 35-2 at 6.  Nothing in the investigation revealed that Jones's presence on his porch or his words put police officers or others in danger.  Nevertheless, Officer Mercer walked

(4:11CV01635)

up to Jones's property and physically apprehended him.  In so doing, Mercer violated Jones's

constitutional guarantees to freedom of speech and freedom from unreasonable seizure.  In addition,

Officer Mercer instigated an altercation that resulted in the use of a choke hold[4] and Jones's arrest.

Notwithstanding Officer Mercer's illegal and provocative actions, the investigation did not regard

his behavior as an "issue . . . to be resolved."  Furthermore, the City cleared Officer Mercer of any

wrongdoing by only focusing on the method of restraint, without addressing why the restraint was

employed.

Another incident involved troubling circumstances surrounding Officer Mercer, his daughter,

and her boyfriend, Chris Perez.[5]  ECF No. 35-3 at 29.  The Internal Affairs investigative file revealed

that on October 22, 2008, Officers Mercer and Mulligan were observing an apartment complex for

drug activity.  ECF No. 35-3 at 29. Officer Mercer reported that he saw several men standing in front

of one of the apartment buildings.  ECF No. 35-3 at 31.  By Officer Mercer's own admission, "they

didn't appear to be doing anything."  ECF No. 35-3 at 31.  Officers Mercer and Mulligan then drove

behind the building.  ECF No. 35-3 at 31.  There, they saw a man looking out a rear door.  ECF No.

35-3 at 29, 31.  Deciding that they should investigate, Officers Mercer and Mulligan exited their

vehicle.  ECF No. 35-3 at 31.  As they approached the building, Officer Mercer "saw a kid running

through the parking lot."  ECF No. 35-3 at 31.  Officer Mercer gave chase, eventually catching this

individual and bringing him to the ground.  ECF No. 35-3 at 31.  Officer Mercer claimed that he did

---

[4] Medical records documented that when Jones went to the hospital the following day, he suffered from "petechial hemorrhaging of the eyes."  ECF No. 35-2 at 7.

[5] The daughter's name was redacted in the file submitted to the Court.

(4:11CV01635)

not know the identity of this person, whom turned out to be Perez, until after he had handcuffed and arrested him for obstruction of official business.  ECF No. 35-3 at 29, 32-33.  Officer Mercer did not find drugs on Perez.  ECF No. 35-3 at 32.  Officer Mulligan, who stopped two other males on the scene, did not find or detect drugs on them, either.  ECF No. 35-3 at 29.

Officer Mulligan told the Internal Affairs investigator that before Perez took off running, he saw Perez trying to get in one of the apartments in the complex.  ECF No. 35-3 at 29.  After Perez had been apprehended, Officers Mercer and Mulligan knocked on the door of that apartment, which, as it turned out, belonged to Mercer's daughter.  ECF No. 35-3 at 29, 31.  According to Officer Mercer's statement to Internal Affairs, he knew that his daughter lived in the apartment complex but did not know in which building.  ECF No. 35-3 at 32.  Officer Mercer informed his daughter that he believed Perez was hiding drugs in her apartment.  ECF No. 35-3 at 31.  Although she disputed that Perez left drugs there, she gave her consent for the police to search the premises.  ECF No. 35-3 at 29.  Officer Mulligan and another police officer searched the apartment and did not find drugs.  ECF No. 35-3 at 24, 31.

The Internal Affairs investigation revealed, beyond the above facts, that Officer Mercer was, at that time, engaged in a custody battle with his daughter over custody of her baby, that Officer Mercer believed Perez was a drug user, and that Officer Mercer had told Officer Mulligan that he wanted Perez to stay away from his daughter.  ECF No. 35-3 at 29-30, 32-33.  The Internal Affairs investigator noted that during his interview, Officer Mercer was "very uncomfortable" and provided

12

(4:11CV01635)

vague, evasive, and conflicting answers regarding how he became aware of possible drug activity

in that area.[6]  ECF No. 35-3 at 32.

Although the record does not divulge the outcome of the investigation, Plaintiff claims that

the City exonerated Officer Mercer of misconduct and took no disciplinary action against him; ECF

No. 34 at 6; facts the City apparently concedes.  *See* ECF No. 36 at 3.  The lack of disciplinary action

is, again, concerning.  Even setting aside the questionable circumstances of Officer Mercer's

presence at the apartment complex, including his ostensible ignorance of where his daughter lived,

when the evidence is viewed in the light most favorable to Plaintiff, Officer Mercer had no basis to

arrest Perez.  True, Officer Mulligan claimed that he ordered Perez to stop before Perez took off

running.  ECF No. 35-3 at 29.  Nevertheless, the officers lacked authority to stop him.  The Sixth

Circuit follows a two-pronged approach for evaluating whether an investigative stop is reasonable:

> (1) whether there was a proper basis for the stop, which is judged by examining
> whether the law enforcement officials were aware of specific and articulable facts
> which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion
> into the suspect's personal security was reasonably related in scope to the situation
> at hand, which is judged by examining the reasonableness of the officials' conduct
> given their suspicions and the surrounding circumstances. . . . In other words, the
> greater the degree of intrusion during a stop, the more solid must be the officer's
> suspicion that the stopped individual is guilty of wrongdoing.

---

[6] According to the investigator's summary of the interview, Officer Mercer claimed that he was tipped off by confidential informants that individuals were smoking marijuana at the complex.  When the investigator ordered Officer Mercer to provide the names of his informants, Officer Mercer first refused, then claimed that one informant was a "white guy from Girard" whose name he could not remember.  Officer Mercer revealed that he had not used this informant for six months.  Officer Mercer further stated that he learned of the drug activity from police department complaints, but claimed that he couldn't remember who gave him the complaints. *See* ECF No. 35-3 at 32.

13

(4:11CV01635)

*Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (quotations omitted). By Officer Mercer's own account, the individuals he observed at the apartment complex did not appear to be doing anything illegal. Moreover, Officer Mercer gave the Internal Affairs investigator vague and evasive answers regarding how he came to believe there was drug activity in that area. Absent specific and articulable facts giving rise to a reasonable suspicion of criminal activity, the officers were not authorized to restrain Perez's freedom. Perez was free to ignore Officer Mulligan's instruction to stop, and Officer Mercer's arrest of Perez for obstructing official business was unjustified and without probable cause. *See United States v. Rosas-Herrera*, 816 F. Supp.2d 273, 279 (M.D.N.C. 2011) (flight may provide probable cause to arrest individual for obstructing investigation if flight was from "lawful" investigatory stop), *aff'd*, 499 Fed. Appx. 249 (4th Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 1303, 185 L. Ed.2d 228 (2013); *May v. Sanna*, No. 09 3253, 2012 WL 1067686 at *10 (D.N.J. March 29, 2012) (obstruction statute applies "only where an individual attempts to leave the scene after being *seized* during an *investigatory stop*" [emphases in original]); *Besteman v. Hager*, No. 06 10223 BC, 2007 WL 1686513 at *5 (E.D. Mich. June 8, 2007) (probable cause for obstructing investigation would require showing that defendant knowingly did not comply with *lawful* command).

Based on the above, the Court concludes that Plaintiff has sufficiently shown, for the purposes of surviving summary judgment, that Officer Mercer has engaged in a pattern of unlawfully seizing Youngstown residents in violation of their Fourth Amendment rights.[7] The City

_____

[7] Plaintiff directed the Court to one other allegation of misconduct in Officer Mercer's personnel file. *See* ECF No. 35-1. The complainant, Stanley Williams, alleged that Officer

(continued...)

14

(4:11CV01635)

undisputedly knew about these incidents, and its consistent failure to properly conduct an investigation or take disciplinary action suffices to demonstrate its deliberate indifference towards the federally-protected rights of its inhabitants.  Officer Mercer was not appropriately investigated or disciplined.  In fact, he was promoted to the rank of Lieutenant.  ECF No. 8 at 4.  Finally, there is enough evidence to create an inference that B.R.'s constitutional injuries were caused by the City's custom of tolerating Fourth Amendment deprivations.  Because the City had taken no action against Officer Mercer for his prior conduct, a jury could conclude that Officer Mercer's intrusive search and seizure of B.R. was a direct consequence of his belief that he could act with impunity in accordance with City custom.

In so concluding, the Court rejects the contention that the evidence contained in the investigative files of the Internal Affairs Division are inadmissible hearsay.  The City claims that

---

[7](...continued)
Mercer removed him from the doorway of a private home, slammed his head onto the porch, kicked him several times, struck him with his hands, and arrested him for obstructing official business.  ECF No. 35-1 at 2.  The Internal Affairs investigation concluded that Officer Mercer's conduct was proper because he used "minimal force."  ECF No. 35-1 at 6.  The investigation also concluded that Williams had been blocking police officers' entry into the home to arrest an individual for whom they had an arrest warrant.  ECF No. 35-1 at 6.
       The dearth of details renders the Internal Affairs conclusions difficult to evaluate.  The findings mention that the police possessed an arrest warrant for an individual who lived in that residence; yet, it is unclear whether Officer Mercer's entry was justified.  *See United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011) (police may enter home without search warrant to execute arrest warrant only if there was reason to believe that subject of warrant was at home).  In addition, although Internal Affairs concluded that Officer Mercer was "forced to use a controlled take down" because Williams "continued to break free and re-enter the residence" when Officer Mercer attempted to "escort" him from blocking the front door, the "witness statements" upon which the findings were based are not included in the investigative file, and the identities of the witnesses were not disclosed in the findings.  ECF No. 35-1 at 6.

(4:11CV01635)

the files should be excluded because they "are accounts of witness statements." ECF No. 36 at 3. The City's argument lacks merit.

"[A] police report . . . [is] admissible as an exception to the hearsay rule either as a business record under Rule 803(6), Fed. R. Evid., or a public record under Fed. R. Evid. 803(8), Fed. R. Evid." *Cooper v. City of New Rochelle*, 925 F. Supp.2d 588, 605 (S.D.N.Y. 2013) (internal quotations omitted); *see* 2 McCormick on Evid. § 288 (7th ed.). To be admissible, however, entries from a police report must generally result from the recorder's personal knowledge or observations. *See Broomes v. Schmidt*, No. 95-4845, 1996 WL 724031 at *3 n.4 (E.D. Pa. December 13, 1996) ("[e]ntries in a police report, unless based on the recording officer's own knowledge and observation, are generally inadmissible as hearsay"). This is because the presumption of accuracy and reliability that attaches to the business record and public record exceptions does not apply to the statements of third-party witnesses who are neither acting in the regular course of business nor under a business or public duty to report. *Jordan v. Binns*, 712 F.3d 1123, 1132 (7th Cir. 2013); *United States v. Pazsint*, 703 F.2d 420, 424-25 (9th Cir. 1983). Second-layer hearsay contained within police reports can be admitted, however, if it falls under a separate hearsay exception or if it is not hearsay at all. *See United States v. Warren*, 42 F.3d 647, 657 n.7 (D.C. Cir. 1994) ("the officers' statements could be admissible under Rule 803(6) if hearsay recorded by the police fell within a separate hearsay exception"); *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp.2d 564, 578 (E.D.N.Y. 2013) ("any double hearsay contained in a [public] report is admissible only if each level of hearsay qualifies independently for a hearsay exception"); *Cooper*, at 606-606 ("the contents of the police reports and the other documents, to the extent that they reflects statements made to police

16

(4:11CV01635)

officers . . . are not offered for the truth of the matter asserted . . . [therefore] they do not constitute hearsay as defined in Fed. R. Evid. 801(c)"); *Boateng v. Holder*, No. CV13 00631, 2013 WL 5353003 at *6 (D. Ariz. September 25, 2013) ("[a]ny second layer of hearsay is cured because the relevant statements in the documents . . . are opposing party statements under Rule 801(d)(2)").

To the extent that the facts recorded in the Internal Affairs files were not derived from the investigators' direct observations, they were obtained from statements made by Officer Mercer or from other police officers, and, therefore, they do not constitute hearsay under Fed. R. Evid. 801(d)(2)(D). Pursuant to that rule, "a statement is not hearsay if it is 'offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012). Here, the second-layer hearsay concerns arising from the Internal Affairs files are resolved because they stem from statements made by police officers, *e.g.*, agents or employees of the City, regarding matters within the scope of the relationship.  The statements contained in the investigative files are, therefore, admissible.

## IV. Conclusion

Based on the above, the Court denies the City's motion for partial summary judgment.  This case is scheduled for trial on April 21, 2014.  A civil trial order will be issued forthwith.


IT IS SO ORDERED.


  February 20, 2014          */s/ Benita Y. Pearson*
Date       Benita Y. Pearson
      United States District Judge